UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Equal Employment Opportunity Commission,

     Plaintiff,

v.                                 Case No. 18-13270

Safie Specialty Foods Company, Inc.,       Sean F. Cox
                                       United States District Court Judge

     Defendant.

_____/

## OPINION & ORDER
## DENYING SUMMARY JUDGMENT MOTIONS

     Plaintiff, the United States Equal Employment Opportunity Commission ("E.E.O.C."),

filed this Title VII employment discrimination action against Defendant asserting a hostile work

environment sexual harassment claim against it on behalf of two former employees, and a

retaliation claim against those same two individuals and two other former employees.  Discovery

has closed and the case is now before the Court on: 1) the Defendant company's Motion for

Summary Judgment; and 2) the EEOC's Motion for Partial Summary Judgment as to liability.

The parties have fully briefed the issues and the Court held a hearing on October 31, 2019.  For

the reasons set forth below, the Court shall DENY both motions and allow all claims in this

action to proceed to a jury trial.

### BACKGROUND

     The E.E.O.C. filed this action against Defendant Safie Specialty Foods Company, Inc. on

October 18, 2018.  The EEOC's complaint includes two counts, both brought under Title VII.

Count I asserts hostile work environment sexual harassment claims on behalf of Nadwa Korkis

and Christina Schoenherr.  Count II asserts Title VII retaliation claims against the Company on behalf of Korkis, Schoenherr, Lisa Karaszewski, and Bryant Hardiman.

Discovery in this case closed on July 5, 2019.  On July 18, 2019, Defendant Safie filed a summary judgment motion.  (ECF No. 17).  On August 5, the EEOC filed a "Motion for Partial Summary Judgment On Liability."  (ECF No. 20).

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

The parties complied with the Court's practice guidelines for motions for summary judgment such that Defendants' summary judgment motion includes a "Statement of Material Facts Not In Dispute" ("Def.'s "Stmt. A") and Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" ("Pl.' s Stmt. A").  In addition, along with Plaintiff's Motion for Partial Summary Judgment, Plaintiff submitted a "Statement of Material Facts Not In Dispute" ("Pl.'s Stmt. B") and in response, Defendant submitted a "Counter-Statement Of Disputed Facts"

("Def.'s Stmt. B").

The relevant evidence submitted by the parties is set forth below.

**The Company And Its Employees And Supervisors**

Defendant Safie Specialty Foods Company, Inc. ("the Company") packages and distributes packaged foods such as pickles, peppers, carrots, and beets. It is located in Chesterfield Township, Michigan. (Stmts. A at ¶ 1).

Mary Safie ("Safie") is the Company's President. Dr. Theresa Pavone is the Vice President of Human Resources and Danielle Rashid was the Consumer Relations and Human Resources Manager at the Company. (Stmts. A at ¶¶ 2-4). Lisa Karaszewski was a Floor Supervisor. Nadwa Korkis was part of the production staff. (*Id*. at ¶ 8). Christina Schoenherr and Bryant Hardiman were temporary employees at the Company and were employed through Allegience Staffing. (*Id*. at ¶ 7).

Hannan Haddad has worked for the Company since 2003. (Haddad Dep. at 11). Haddad is the Quality Assurance / Production Manager. (*Id*. at 16). Haddad's husband, Wajdi Al-Hanna ("Al-Hanna")[1], was hired after her and became a Team Leader. (*Id*. at ¶¶ 5-6).

**The Company's Sexual Harassment Training And Policy**

The Company conducted periodic sexual harassment training and had sexual harassment policies in place. (Stmts. A at ¶¶ 9-10). The Company's sexual harassment policy that was in place on March 4, 2015 was the same one in place in February of 2016. (Stmts. B at ¶ 1). The second paragraph of that policy pertains to employees who feel that they have been the victim of

---

[1]This individual's name is referenced differently throughout the parties papers (eg., it is sometimes referenced as "Alhanna," and he is also referred to at times as "Joe." His Michigan driver's license lists his last name as Al-Hanna. (ECF No. 22-33).

harassment and states, "If you believe that you have been the victim of harassment, or know of another employee who has, report it immediately . . ." (*Id*. at ¶¶ 2-3). The third paragraph of that policy pertains to a supervisor who becomes aware of allegations of harassment and states, "Any supervisor who becomes aware of possible harassment should *promptly advise their supervisor or Human Resources Representative* who will handle the matter in a timely and confidential manner." (*Id*. at ¶¶ 4-5) (emphasis added).

### Evidence Regarding The Company's Prior Notice Of Al-Hanna's Behavior

Kristine Parker was employed as a Production Floor Supervisor from February of 2012 through March of 2014 and reported to Haddad. (Parker Dep. at 8-10). Parker testified that, while she was a supervisor at the Company, Al-Hanna was a team lead for cooks. (Parker Dep. at 11). She testified that she reported to Haddad and was discouraged from going to Safie. Although Parker was a supervisor and Al-Hanna was just a team lead, Haddad told Parker that she did not have authority over her husband, or another employed named Frank. (*Id*. at 14).

During the years she was employed at the Company, Parker observed Al-Hanna interact with other employees of the Company and observed him commit acts that she believed violated the Company's sexual harassment policy. (*Id.* at 15-16). For example, Parker testified that Al-Hanna would go up to female employees and make gestures or motions with his hands, putting them down by his penis and say the arabic word for "pussy." (*Id*. at 16-18).

Parker testified that she observed Al-Hanna approach a female employee named Becky in an inappropriate manner:

> Q.   Okay.  Did you observe any interactions between Wajdi and Becky?
> A.   He would always go up to her and get close to her.  I never saw him touch her.
> Q.   Okay.

| | |
|---|---|
| A. | And she would say just go away, go away. |
| Q. | When you observed Wajdi using the word couscous and grabbing his – well – |
| A. | Making a gesture. |
| Q. | Making a gesture, did anybody tell him to stop? |
| A. | Hanan would. |
| Q. | Hanan would tell him to stop? |
| A. | And when I would see him do it, sometimes I would be, like, knock it off, Wajdi. Stop, Joe. |

(Parker Dep at 19).  Parker testified that Al-Hanna would stop when confronted, but would just continue doing the same thing later.  Parker testified that she was told by Haddad not to go to Safie and that she reported Al-Hanna's inappropriate behavior to Haddad:

| | |
|---|---|
| Q. | Does Mary [Safie] know about – did you ever report this behavior to Mary, Wajdi's behavior to Mary? |
| A. | You could not go to Mary with anything with Joe. |
| Q. | Why not? |
| A. | You were told not to by Hanan. |
| Q. | So did you go to Hanan and report Wajdi's behavior? |
| A. | Yes. |
| Q. | And what did Hanan say to you? |
| A. | She'll take care of it. |

(Parker Dep. at 19-20).  Parker further testified that when she did try to report Al-Hanna's behavior to Safie anyway, it was not well-received, and that Haddad's own supervisor heard Haddad make inappropriate sexual remarks and did nothing:

| | |
|---|---|
| Q. | Do you recall a conversation you had with Mary Safie about Wajdi's sexual comments and Mary told you to leave the situation alone? |
| A. | We would tell Mary things and we would be said to leave things alone, it would be handled, get out of my office, ass hole. |
| Q. | Who would say that to you? |
| A. | Mary Safie has called everybody an ass hole. You had no respect.  I had no respect as a supervisor.  I was a puppet.  Whatever Hanan would tell me to do, I had to follow through. |
| Q. | So, again, as far as Wajdi's sexual behavior that you observed and that you spoke about earlier, is it your testimony that you believe that even if you told Mary – I mean, what would you think, based on working with Mary, what would she do? |

. . . .

A.    I know nothing would have been done. It didn't matter. I went to my supervisor about what Hannan was saying to me and he did nothing, so –

Q.    When you say your supervisor, when you say he, who are you talking about?

A.    My supervisor was Chuck, Chuck Drogosch. He was standing there when things were being said.

Q.    What things are you talking about, Ms. Parker?

A.    Hanan Hadadd, when she found out that I was gay, said I needed to go on a trip with Mary, one of the business trips and have sex with Mary to make her more relaxed.

(*Id.* at 20-21).

Fabiola Lopez gave a sworn statement stating that she worked at the Company for six years. Lopez states that she worked with Al-Hanna and that he made sexually inappropriate comments at the workplace the entire time she worked with him, and that his wife (Haddad) heard him make those comments. She also testified that Al-Hanna "stared a lot" at female employees. (ECF No. 22-40).

### The Alleged Conduct By Al-Hanna That Created A Hostile Work Environment For Korkis And Schoenherr

Korkis began working at the Company in January of 2015. (Korkis Decl., ECF No. 20-15). Korkis states that Al-Hanna sexually harassed her the entire time that she was employed at the Company. (*Id.*). As to that harassment, Korkis states that:

8.    . . . . He asked me to meet with him at the Meijer store near Safie and I refused.

9.    Alhanna also asked me to meet him outside of work for sex. This happened approximately ten times. He said to me that he loved me, and that he wanted me to meet him somewhere where people at work could not see us. I told him no, I am a married woman, and to stop asking me because he was like a father or an older uncle.

10.    Almost every day, Alhanna would make sexual comments to me. Sometimes he would say them loudly, other times he would whisper them

inches from my ear.  The things he would say included:

• "Oh my God, my heart is hurting me, My God make her safe . . ."
• "Mary Mother of God, save the floor Nadwa walks on, what is this ass she has"
• "I love your ass", "I love your butt"
• "Oh my God, I dreamed about you"
• "In my dreams, I feel your boobs and your butt . . . Oh my God!"
• That he would like to "fuck me."
• "In my dreams, I have fucked you, and it was so good . . . !"

11.     On a daily basis, Alhanna stared at my breasts and butt. He would repeatedly walk behind me staring at my butt.

12.     On a daily basis, Alhanna would find any opportunity he could to bump into me or stand right next to me with his shoulders or hip touching me. On several occasions, he followed me up the stairs for no reason, looking at my butt.  Because the area where the stairs are is so small, Alhanna would purposely push his body up to mine and would intentionally touch my butt.

13.     Alhanna sat near me during lunch and he would touch me on my leg.  I would often choose to sit in my car to eat because he made me feel so uncomfortable.

14.     His sexual comments and behavior made me extremely uncomfortable and made it difficult to work.  I often dreaded coming to work because I was afraid of what Alhanna would do or say.  I told Alhanna to please stop talking to me that way because it was not right.

15.     On a daily basis, Alhanna tried to get me to eat the food that he cooked. I would always refuse.

16.     One day, Alhanna forced food into my mouth with his bare hands, forcing his fingertips in my mouth.  I was disgusted. It seemed like his purpose was to get a part of his body inside my mouth.

17.     Alhanna would get upset if men working at Safie spoke to me.  Certain men were afraid to speak to me because they were afraid of Alhanna.

. . . .

18.     One day during the summer of 2015, it was extremely hot on the production floor and everyone was wearing tank tops or short sleeved shirts instead of the wrap around jacket we normally wear.  I wore a short

7

sleeved shirt that day, and Alhanna was staring at my breasts. Haddad was standing close to us while this was happening.

19.    The next day, Haddad told me to make sure I wear a jacket to work, even though it was very hot and everyone was wearing tank tops and short sleeved shirts.

20.    I believe Haddad saw Alhanna constantly harass me and harass Christina Schoenherr. Haddad usually stood very close to me or next to me while I was cutting beets. Haddad could see and hear Alhanna while he was making sexual comments to me and touching me.

. . . .

27.    I saw Alhanna touch Christina Schoenherr. He would touch her on her shoulders. He would try to hug her and she would jump away. When Alhanna got very close to Schoenherr, I saw her put her head down and try to move away from him.

28.    I heard Alhanna talk about Christina Schoenherr in a sexually suggestive manner almost daily.  He would talk about her breasts to people on the production floor. He said that she had a big ass in Arabic. He would stare at Schoenherr's butt and breasts.

(*Id*. at ¶¶ 8-28).

Christina Schoenherr was a temporary employee at the Company who began working there in December of 2015.  (Schoenherr Decl., ECF No. 2016).  Schoenherr also claims to have been sexually harassed by Al-Hanna while working at the Company:

8.    Wajdi Alhanna and Hannan Haddad directed what I did at work.  Alhanna would tell me where to stand, tell me where I had to work (assign my table), and assign me tasks on a daily basis (e.g. peel beets or pack pickles).  I knew Wajdi Alhanna as "the cook" or "Joe."  Haddad is Alhanna's wife.

. . . .

12.    Soon after I began working at Safie, Alhanna started saying and doing sexually suggestive things toward me on a daily basis.  Alhanna made me feel very uncomfortable on a regular basis.

13.    Alhanna would call me "sexy kiki", "sexy lady", and "pretty lady" while I worked.  This occurred on a daily basis. He also stood close enough to me to make me feel uncomfortable, and he constantly stared at me.  He

whispered in my ear how he desired me. I would feel his breath on my ear and neck. This also happened on an almost daily basis.

14.     I tried to move away from Alhanna, kept my head down, and never responded to his sexual advances. I did not initially report Alhanna because I was afraid that I would lose my job if I did report him.

15.     Bryant Hardiman was another temporary employee who worked at Safie.

16.     Alhanna would also tell Hardiman not to stand next to me while we were working and would often make him work somewhere else.

17.     Haddad saw Alhanna make sexual advances towards me and other women who worked at Safie. Haddad never stopped him, even though she was usually within twenty feet and in plain sight of him while he was acting inappropriately. Haddad would give Alhanna the evil eye, but he ignored her.

18.     Nadwa Korkis was another woman who was subjected to sexual, inappropriate comments from Alhanna. While working at Safie, I heard Alhanna make sexual comments to her and address her inappropriately.

19.     On a regular basis, Alhanna ordered Hardiman to take me out to lunch on his behalf, gave Hardiman money for my lunch, and told Hardiman to tell me that he was interested in me.

20.     I was offended by Alhanna directing Hardiman to take me to lunch. I repeatedly told Hardiman that I was not interested in having a relationship with Alhanna. I told Hardiman that I could not be bought and I felt like Alhanna viewed me as a hooker. Because of the way Alhanna treated me, I thought he was a horny pig.

21.     The stress caused by Alhanna's comments and behavior increased as it went on every day for months. It eventually became unbearable.

(ECF No. 20-16).

**Schoenherr Reports Al-Hanna's Conduct To A Supervisor, Karaszewski**

Korkis's Declaration states that on February 24, 2016, Schoenherr approached her and was very upset and shaking. (Korkis Decl., ECF No. 20-15, at 29). When Schoenherr told Korkis that Al-Hanna told her to meet in the parking lot the upcoming Sunday and that she was

scared, Korkis told Schoenherr to report Al-Hanna to her supervisor. (*Id*. at ¶ 32).

"[O]n February 24, 2016, at approximately 3:00 p.m., Schoenherr reported to Karaszewski that [Al-H]anna called her 'sexy kiki,' that he did not want her to talk to Hardiman, and that he wanted her to meet him Sunday at work because he 'can't do it after work.'" (Stmts. A at ¶¶ 16-17). That report to Karaszewski occurred approximately forty-five minutes before closing. (ECF No. 22-4).

Schoenherr's Declaration states that on February 24, 2016, Al-Hanna's conduct prompted her to report him to a supervisor:

24. On Wednesday, February 24, 2016, Alhanna approached me while I was working at Safie and told me to meet him on Safie's parking lot on the up-coming Sunday. I told him "no," we don't work on Sundays. Alhanna told me that what he wants to do could not be done during work hours.

25. Because Alhanna had been saying sexual things and making sexual advances on a daily basis for months, I knew what Alhanna wanted from me was sexual. Safie is closed on Sundays. I again felt as if Alhanna viewed me as some type of hooker, or person required to give him sex.

26. Alhanna was not asking me to meet him. It was an order.

27. I became very upset and afraid. I did not want to meet Alhanna but I was afraid that if I did not meet him on Sunday, I would not have a job on Monday. Based on what I had seen, I believed that temporary employees who crossed Alhanna got fired. I have a home and a son and was very worried, concerned for my safety, and shaken up.

28. Because I was ordered to do something outside of work that I felt placed me in danger, I went to speak with my supervisor, Lisa Karaszewski.

29. I told Karaszewski what Alhanna said to me, and I told her what had been saying and doing to me for several months.

30. Karaszewski replied, "Oh my God, he is at is again", and she said "I have to report this. Karaszewski told me that Alhanna did this to another woman a couple of years back.

31. Karaszewski left right away. I did not see where she went.

(ECF No. 20-16).

Schoenherr last worked at the Company on the February 24, 2016 – the same day she made her harassment report to Karaszewski. Schoenherr's Declaration states that production at the Company was shut down on February 25, 2016, due to weather. On February 26, 2016, Allegience Staffing Agency contacted Schoenherr and told her that her assignment at Safie had ended. Allegiance told her that her assignment had ended because production had slowed down. (Schoenherr Decl., ECF No. 20-16 at ¶¶ 35-36). After her assignment at the Company was terminated, however, Schoenherr saw on Facebook that Lashay Calhoun and Joseph Odom – who were also temporary employees – continued to work at Safie after [her] assignment was terminated" even though they "had just started working at Safie the same week [she] was terminated." (*Id*. at ¶ 38).

Neither Pavone (the Company's President of Human Resources) nor Rashid (the Company's Human Resources Manager) were in the office from February 24, 2016 to February 26, 2016. (Stmts. B at ¶¶ 44-45). Karaszewski could not find anyone in Human Resources to report Schoenherr's complaint to that day, February 24, 2016. She did not report the incident to Safie, who was present that day, but she made an effort to find Safie. (Stmts. A at 18-19; Karaszewski's Dep. at 63). Karaszewski did not report the incident to anyone the next day, February 25th, as the Company' was closed due to inclement weather. On the morning on February 26, 2016, when the Company reopened, Karaszewski reported the incident to Cusumano, the Food Safety Manager. (Stmts. A at ¶ 21).

Cusumano told Karaszewski that she should draft an incident report and bring it back to

her and gave her a form to complete.  Karaszewski completed the incident report and returned it

to Cusumano.  (Stmts. A at ¶¶ 22-23).  Karaszewski testified that later that day, February 26,

2016, she spoke with Safie:

> Q.    What was said during this conversation?
>
> A.    Okay.  I told Mary Safie that Christina had reported a sexual harassment
>       incident to me.  And Danielle was out of town. Mary said don't breath a
>       word of this to anybody or else it's your job.  And I said, you know, I'm
>       an adult, and as a supervisor I know better, but I want to let you know
>       Mary, I'm not the only one who knows about this.  Because I was afraid
>       that once it got through the factory, I would get blamed for it. And I told
>       Mary at that point, she said, who else knows about this, and I said Nadwa
>       Korkis and Bryant Hardiman.

(Karaszewski Dep. at 92).

Karaszewski reported Schoenherr's sexual harassment complaint to Cusumano on

February 26, 2016.  That was the last day that Karaszewski worked at the Company, as the

Company suspended her that same day.  (Stmts. B at ¶ 23).  The Company later terminated

Karaszewski and stated that the reason why she was terminated was the Company's policies

"require supervisors to promptly report complaints of harassment to their supervisor or a Human

Resources Representative" and that she failed to promptly report the complaint she received

from Schoenherr.  (ECF No. 17-13).

During discovery, an email exchange between Allegiance Staffing and Rashid was

produced.  (ECF No. 20-29).  Tonisha Williams sent an email to Rashid at the Company stating

"I was informed by Mary that Safie is reaching their slow season and that she *did not want*

*Christina Schoenherr or Bryant Hardiman on the property*."  (*Id*.) (emphasis added). When

Rashid asked Williams the date on which that phone call with Safie took place, Williams

responded, "I believe it was 2/26/16."  (*Id*.)

**Hardiman's Interactions With Management About The Complaint Against Al-Hanna**

By February of 2016, Bryant Hardiman had been a temporary employee at the Company for approximately five months. Hardiman cooked for the Company on a daily basis and worked in all areas of the production floor. Management viewed him as a good employee and cross-trained him on different areas of the production floor. (Stmts. B at ¶ 24).

On February 26, 2016, Hardiman told Cusumano, a member of the Company's management team, that Al-Hanna had sexually harassed Schoenherr for months, and that Schoenherr was uncomfortable and would sometimes go home, and that Al-Hanna would get upset if Hardiman stood by Schoenherr. Approximately two hours after Hardiman spoke to Cusumano, the Company told Hardiman his services "were no longer needed since Safie was shutting down." (Stmts. B at ¶ 29).

It is undisputed that the Company allowed two other temporary employees, who had not worked at the Company as long as Hardiman, to continue to work for weeks after that. Those temporary workers were LaShay Calhoun and Joseph Orum. (Stmts. B at ¶ 30).

**Korkis's Interaction With Management And Subsequent Termination**

Korkis's Declaration states that on February 27, 2016, Haddad approached Korkis at work and asked her what had happened between her husband and Schoenherr. Korkis told Haddad that her husband had been harassing Schoenherr, that he kept telling her she was beautiful and to meet him on Sunday, and that Bryant Hardiman knew about it as well, as her husband gave Hardiman money to buy Schoenherr lunch. Haddad responded to Korkis by saying her husband was "just being nice." (Korkis Decl. at ¶ 35-38).

Korkis asserts that, a few hours later, Safie approached her in a hallway where other employees could see and hear them, and started yelling at her about another employee named Fadi Nissan. Korkis further states:

40. Safie yelled, "Nadwa, you are an older woman . . . shame on you!" I asked her what she was talking about and I told her I don't have anything to do with Fadi Nissan. I am a grandma and a married woman!

41. At that point, Hannan Haddad directed me to come into the conference room. Mary Safie also came into the conference room.

42. Once I got into the conference room, there was no more talk about Fadi. Haddad said, right away, "What happened? What did Christina tell Lisa?" They then asked me all sorts of questions about whether Alhanna was sexually harassing Schoenherr and what I had seen and heard.

43. I told them I could not tell what Schoenherr told Lisa because I was not there.

44. I then told Safie and Haddad that Schoenherr told me everything, and that [she] had come up to me shaking, scared, and very upset. I told them that Schoenherr told me:
    • Alhanna told her that he loved her;
    • Alhanna told her to meet him in the parking lot on Sunday;
    • Alhanna told Bryant Hardiman that he would fire Hardiman if Hardiman did not take Schoenherr out to lunch and tell her how Alhanna felt about her;
    • Alhanna gave Hardiman money to take Schoenherr out to lunch;

45. I told Safie and Haddad that Alhanna made sexual comments to Schoenherr and told her she was beautiful.

46. I told Safie and Haddad that I told Schoenherr not to be afraid to report Alhanna to Karaszewski or Haddad. I thought was Alhanna was doing to Schoenherr was against the law.

47. Fadi Nissan came into the room and said, "What is the problem? What is this I am hearing? What is going on? It is not right that you say we have a relationship together."

48. Safie and Haddad told Nissan that they were not discussing him and they

both gave him a hug.

49. Nissan walked out and said, "Have a nice day."

50. I believe that Mary Safie created the scene in the hall where she was yelling at me about Fadi Nissan to make up a reason to fire me.

(Korkis Decl. at ¶¶ 40-50).

Korkis states that she worked on the next two days the Company was open, February 29, 2019, and March 1, 2019. (*Id*. at ¶ 52). When Human Resources Manager Rashid returned to work on March 2, Korkis was called in to a meeting with her and Pavone:

55. Rashid and Pavone tried to make me sign a paper right away, but I asked, "What is this?" and refused to sign anything.

56. Rashid and Pavone asked me about my meeting with Mary Safie on Saturday. They asked me what the meeting was about and I told him that it was about Schoenherr's complaint against Alhanna.

57. Rashid and Pavone asked me what Safie said about Fadi Nissan and I told them that the meeting in the conference room was not about Fadi Nissan. Rashid and Pavone then looked at one another.

58. Rashid and Pavone told me to go home. I asked them why. I became upset and started to cry because I needed my job to pay my bills.

59. Rashid and Pavone told me that I was not fired but they needed to figure out what happened.

60. Rashid and Pavone did not leave Safie's facility like I had been doing since I worked there. I usually exit the facility by going out of the back door near the production floor. They made me exit by going out the office door. I believe they did not want me to talk to anyone on the production floor when I left.

61. At no point on March 2, 2016 or any other time did anyone tell me I was being suspended or fired because of anything that happened between Fadi Nissan and I.

62. I was never written up, reprimanded, or in any way told that my interactions with Fadi Nissan were interfering with my or anyone else's

15

ability to work.  Nobody ever told me I was creating a hostile work
environment.

63. I never got into a food fight with Fadi Nissan at Safie. I was never
disciplined in any way for getting into a food fight with Fadi Nissan.

64. Fadi Nissan never punched me, hit me, kicked me or physically hurt me
while we worked at Safie.

65. March 2, 2016, was the last time I worked at Safie.

66. I called Rashid a couple of times to follow up and ask when I could return
to work, but I did not receive a call back.

67. No one at Safie ever returned my call.

68. I then received a letter dated March 11, 2016, which stated my
employment at Safie had ended.

(Korkis Decl. at ¶¶ 55-69).

The Company has a different version of the facts as to the meeting that took place

between Safie and Korkis.  Safie testified that while she was on the production floor on February

27, 2016, she saw Fadi Nissan physically hit Korkis and saw him kick her hard several times.

Safie states that she then took Korkis into a conference room to talk about that.  Safie testified

that she did not talk to Korkis about the sexual harassment complaint involving Schoenherr at all

during that meeting. Safie testified that while she and Korkis were in the conference room,

Korkis said "he's not doing anything to hurt me and I can do what we're doing.  This is personal,

this is none of your business."  Safie testified that she responded by telling Korkis "[y]ou are

causing a hostile work environment.  People are uncomfortable" and then Nissan kicked the door

open, hit Korkis again right in front of Safie, and asked Safie "what are you going to do about

it?"  Safie testified that she told Nissan to get out.  Safie testified that she "should've called the

police."  (Safie Dep. at 175-84 & 187).  Safie further testified:

| Q. | Ma'am, did you fill out an incident report about seeing Fadi kick Nadwa hard on the floor on February 27? |
|----|----|
| A. | I don't think I did. |
| Q. | Why not? |
| A. | I don't know. Too damn busy with everything else. I don't know that I did, but everybody knows. |
| Q. | You were furious with Lisa for not turning in an incident report immediately, correct? |
| A. | Uh-huh. |
| Q. | And you saw a male employee kicking a female employee and you didn't bother doing one at all, correct? |
| A. | I don't know if I did. I don't remember. I don't know. I can look. I don't know if anything was given to you. |

(*Id.* at 185).

No incident reports regarding Nissan hitting or kicking Korkis have been produced by the Company. Indeed, it is now undisputed that "[t]here is no documentation in Korkis's personnel file about Fadi Nissan touching Korkis in any way." (Stmts. B at ¶ 42).

The Company's March 11, 2016 letter to Korkis had a regarding line that stated "Status of Employment" and the body of it stated only "Effective immediately, please be advised that your employment with Safie Specialty Foods has ended. We wish you well in your future endeavors." (ECF No. 20-26). That letter was signed by Rashid, the Company's Human Resources Manager. Rashid testified as follows regarding that letter:

| Q. | Why is there no reason for the termination in this letter? |
|----|----|
| A. | There just isn't. |
| Q. | Every other termination letter that you have seen has a reason, correct? |
| A. | Yes. |

. . . .

| Q. | As of when you were sending this, did you have concerns about why Miss Korkis was being terminated? |
|----|----|

> A.   I did have concern, yes.
>
> Q.   Were you questioning in your own head this doesn't really make sense to me?
>
> A.   Yes.

(Rashid Dep. at 140-42).

The Company claims that "Korkis was terminated because she was disruptive on the floor by getting into physical altercations with Nissan. (ECF No. 17 at PageID.84). As to Korkis's termination, Safie testified that Korkis was terminated on March 2nd, not the 11th. Safie also testified as follows:

> Q.   So does the reason remain the same, that you terminated her on March 2nd because she was a continual disruption?
>
> A.   Yes.
>
> Q.   And is that what you were referring to before of her repeatedly getting hit and kicked?
>
> A.   Yes.
>
> Q.   And not complaining about it?
>
> A.   Yes.
>
> Q.   So the continual disruption is that she was basically getting hit and kicked by another guy and not complaining about it?
>
> A.   Yeah.
>
> Q.   So why didn't you just fire Fadi?
>
> A.   I think he quit. We brought – they brought them all in and I came, whatever, they talked and I obviously said yes, but a face-to-face, I did not do.
>
> Q.   So you didn't interact with Fadi or Nadwa at all face-to-face on March 2nd?

| | | |
|---|---|---|
| A. | No. | |

A.    No.

Q.    If Fadi quit, why did you still have to fire Nadwa?

A.    That's what I said, I don't know if Nadwa was fired.  Ask Theresa and Danielle, please, ask them.

Q.    I'm asking you because it's been presented to me under oath that you fired her?

A.    I don't remember.

Q.    So sitting here today, you don't know why Nadwa Korkis was fired?

A.    I don't know why she would've been fired.

Q.    Okay.

A.    Other than she created a hostile work environment.

Q.    Well, how did she create a hostile work environment if she was the one getting hit and kicked?

A.    Because she allowed the abuse to continue and would do nothing about it.

Q.    Okay.

(Safie Dep. at 209-11).

### Al-Hanna's Termination

Al-Hanna had been working at the Company since January 25, 2011.  Karaszewski reported Schoenherr's complaint to the Company on February 26, 2016.  Karaszewski was suspended that same day, for having failed to promptly report the complaint about Al-Hanna to the Company.  Al-Hanna was not suspended at that time.

On March 3, 2016, Karaszewski filed a formal Charge of Discrimination with the Michigan Office of Civil Rights, alleging that the Company suspended her in retaliation for her having reported sexual harassment by Al-Hanna.  (ECF No. 22-4).

The Company then suspended Al-Hanna on March 10, 2016, after the Company received Karaszewski's Charge of Discrimination.  The Company would not have suspended Al-Hanna if Karaszewski had not filed a Charge of Discrimination.  The Company later terminated Al-Hanna on April 1, 2016.  If Karaszewski had not filed a Charge of Discrimination, it would not have terminated him.  (Stmts. B at ¶¶ 12-14).

## STANDARD OF REVIEW

Summary judgment will be granted where there exists no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts an inferences in the light most favorable to the nonmoving party."  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).

## ANALYSIS

In this action, the EEOC asserts a Title VII hostile work environment sexual harassment claim against the Company on behalf of Korkis and Schoenherr.  It also asserts a Title VII retaliation claim against the Company on behalf of Korkis, Schoenherr, Karaszewski, and Hardiman.

Defendant filed a summary judgment motion, seeking summary judgment in its favor as to all claims.  Defendant contends that the hostile work environment sex harassment claims fail because: 1) the alleged conduct by Al-Hanna was not severe or pervasive enough to constitute a

hostile work environment under Title VII; and 2) the EEOC cannot establish employer liability. Defendant contends it is entitled to summary judgment on the retaliation claims because: 1) the EEOC cannot establish a casual connection between the employees' protected activity and the Company's decision to terminate them; 2) and the EEOC cannot show that the Company's stated legitimate, non-discriminatory reason for the terminations is a pretext for illegal retaliation.

The EEOC opposes Defendant's motion and filed its own summary judgment as to liability only. The EEOC asserts that it is entitled to summary judgment as to liability for the hostile work environment sexual harassment claims because the unrefuted evidence establishes that the Company had a hostile work environment and that the Company knew or should have known that its employee was engaging in illegal conduct and failed to stop it. The EEOC contends it is entitled to summary judgment on the retaliation claims, as to liability, because the unrefuted evidence shows that all four of the employees at issue engaged in protected activity and were then suspended or fired within hours or days of that protected activity and no reasonable juror could conclude that the Company's purported reasons why they took the action are legitimate.

## I.      Title VII "Hostile Work Environment" Sexual Harassment Claims

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). That is what the EEOC alleges here, on behalf of Korkis and Schoenherr, in Count I.

To establish a prima facie case of hostile work environment sexual harassment under Title VII, a plaintiff must each demonstrate by a preponderance of the evidence that: 1) she was a member of a protected class; 2) she was subjected to unwelcome sexual conduct or communication; 3) the conduct or communication occurred because of her sex; 4) the unwelcome sexual conduct was severe or pervasive enough so as to affect the terms and conditions of employment and create a hostile work environment; and 5) employer liability. *Thornton v. Federal Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008); *Marotta v. Ford Motor Co.*, 119 F.Supp.3d 676, 688 (E.D. Mich. 2015).

Here, the Company "does not dispute that the first three elements" of Plaintiffs' prima facie case "are met on the present record." (ECF No. 17 at Page ID 76). But the Company claims that the EEOC cannot establish: 1) that Al-Hanna's conduct was sufficiently severe or pervasive enough to create a hostile work environment; or 2) employer liability.

### A. Was The Conduct Severe Or Pervasive Enough To Create A Hostile Work Environment?

The Sixth Circuit considers the question as to whether harassment "was so severe and pervasive as to constitute a hostile work environment to be 'quintessentially a question of fact.'" *Smith v. Rock-Tenn Svs., Inc.* 813 F.3d 298, 310 (6th Cir. 2016) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

"To determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citations omitted). "The factfinder must evaluate the conduct at issue by both an objective and subjective standard," and that "requires a plaintiff to establish both that the harassing

behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive." *Id*. The Sixth Circuit has explained that:

> The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a "mathematically precise test." *Abeita,* 159 F.3d at 251 (citation omitted); *see also Harris,* 510 U.S. at 21, 114 S.Ct. 367 (using the phrase "severe *or* pervasive" as opposed to "severe *and* pervasive"). Conduct that is merely offensive is not actionable. *Harris,* 510 U.S. at 21, 114 S.Ct. 367. To be actionable, the harassment must consist of more than words that simply have sexual content or connotations. *Knox,* 375 F.3d at 459–60 (holding that various comments and foul language were not severe or pervasive); *see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that plaintiffs must prove more than that a comment was tinged with offensive sexual connotations). Instead, the workplace must be permeated with "discriminatory intimidation, ridicule or insult" sufficiently severe or pervasive to alter the conditions of employment. *Meritor Sav. Bank,* 477 U.S. at 65–67, 106 S.Ct. 2399. A nonexhaustive list of factors for the court to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Jordan,* 464 F.3d at 597 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367).

*Id.*

"[S]exual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive." *Id*. In addition, the Sixth Circuit "has also made clear that harassment involving an 'element of physical invasion' is more severe than harassing comments alone." *Id*. at 334.

In its summary judgment motion, the Company asserts that the alleged conduct here is not sufficiently severe or pervasive enough to constitute a hostile work environment and asks the Court to grant summary judgment in its favor as to Count I. The Company's motion references allegations in the complaint as to the harassing conduct and claims it is not sufficient. The

Company asserts that the alleged comments were merely offensive.

The Company's request for summary judgment must be denied. In opposing the Company's summary judgment motion, and in support of its own motion seeking partial summary judgment as to liability, the EEOC submitted detailed declarations from Korkis and Schoenherr. They claim the harassment from Al-Hanna was ongoing and continual and they also allege incidents involving aspects of physical invasion. The Court concludes that the EEOC has presented sufficient evidence to create an issue of fact as to whether the harassment was severe and pervasive enough to constitute a hostile work environment.

The EEOC asks the Court to go further and rule that it is entitled to summary judgment. The EEOC has not directed the Court to any cases wherein such a ruling has been made. As the issue of whether a hostile work environment is quintessentially an issue of fact, the Court declines to enter summary judgment in favor of the EEOC and shall allow the jury to make the determination as to whether the conduct was sufficiently severe or pervasive enough to constitute a hostile work environment.

### B.      Can The EEOC Establish Employer Liability?

The Company's motion also asserts that it is entitled to summary judgment as to the hostile work environment claims because the EEOC cannot establish employer liability.

Even if a hostile work environment is established, the "employee alleging sexual harassment by a coworker must still establish that the employer is liable because it knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action." *Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 338 (6th Cir. 2008).

As both parties recognize in their briefs, this case involves alleged coworker harassment.

"[W]hen coworker harassment is at issue, an employer is not liable for 'mere negligence,' but is liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins, supra*, at 338 (quoting *Blankenship v. Parke Care Ctrs., Inc.,* 123 F.3d 868 (6th Cir. 1997)).

Here, the EEOC has presented sufficient evidence such that a reasonable juror could conclude that the Company knew or should have known about Al-Hanna's harassment. The EEOC has presented evidence that, if believed by the jury, would show that, prior to the alleged conduct with Korkis and Schoenherr, Al-Hanna engaged in sexual harassment at the workplace and that at least two supervisors (Haddad and Parker) were aware of that inappropriate conduct, and that supervisors and employees were discouraged from reporting misconduct to Safie. Then, as to the alleged conduct towards Korkis and Schoenherr, the EEOC has submitted evidence that Haddad – a supervisor for the company – saw that conduct and failed to do anything about it. As such, the EEOC has presented sufficient evidence to create an issue of fact at to employer liability.

Again, however, the EEOC asks the Court to go further and rule as a matter of law there is employer liability and grant summary judgment as to liability as to the hostile work environment claims. The Court declines to do so, and shall allow those claims to proceed to a jury trial.

## II.     Title VII Retaliation Claims

"A separate provision of Title VII prohibits an employer from discriminating against an employee who opposes any practice made an unlawful employment action under Title VII." *Galeski v. City of Dearborn,* 435 F. App'x 461, 468 (6th Cir. 2011) (citing 42 U.S.C. § 2000e-

3(a)).  The EEOC asserts such retaliation claims against the Company on behalf of Korkis,

Schoenherr, Karaszewski, and Hardiman.  The EEOC claims that the Company fired or

suspended them after they engaged in protected activity (ie., reporting sexual harassment by Al-

Hanna or providing information in support of a complaint).

In the absence of direct evidence, which the EEOC does not claim to have here, these

claims are analyzed under the familiar *McDonnell Douglas* framework.  *Id.*

### A.     Prima Facie Case – Can The EEOC Show A Causal Connection?

In order to establish a prima facie case of retaliation, a plaintiff must show that: 1) the

plaintiff engaged in a protected activity, 2) Defendant knew that the plaintiff engaged in that

protected activity; 3) Defendant took an adverse, retaliatory employment action against the

plaintiff thereafter, or the plaintiff was subjected to severe or pervasive retaliatory harassment by

a supervisor; and 4) there was a causal connection between the plaintiff's protected activity and

the adverse employment action.  *Id*. at 468-69.

Here, the only element in dispute is the fourth element.  The Company contends that, as

to all four employees, the EEOC cannot establish a causal connection between their protected

activity and their terminations.  It contends that temporal proximity is not enough to establish the

fourth element.

The Sixth Circuit has cautioned against drawing an inference of causation based on

temporal proximity alone, except in situations where the adverse action occurs very soon after

the protected activity.  It explained these concepts in *Barrow*:

> We generally caution against the permissibility of drawing an inference of
> causation from temporal proximity alone, but "[w]here an adverse employment
> action occurs very close in time after an employer learns of a protected activity,
> such temporal proximity between the events is significant enough to constitute

evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). If "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action," the employee must offer additional evidence of causation. *Id.* For example, a two-month lapse between a plaintiff's protected activity and occurrence of the materially adverse action may be sufficient to satisfy a plaintiff's prima facie case of retaliation. *Rogers*, 897 F.3d at 776–77. However, a gap of approximately four-to-five months is insufficient, without additional evidence, to imply causation. *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013). Other evidence supporting a causal link "has commonly included evidence of additional discrimination occurring between the date at which the employer learned of the protected activity and the date of termination or other adverse employment action." *Mickey*, 516 F.3d at 526. For example, a plaintiff could show increased scrutiny of his work before he was terminated, *Hamilton v. General Electric Co.*, 556 F.3d 428, 436 (6th Cir. 2009), or that he suffered verbal threats soon after the protected action, *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). We have also found sufficient evidence of causation where the plaintiff's supervisor treated her "with exceptional harshness shortly after the initial EEOC filing," and gave the plaintiff "an unmanageable workload." *Brown v. Lexington-Fayette Urban Cty. Gov't*, 483 F. App'x 221, 227 (6th Cir. 2012).

*Barrow v. City of Cleveland*, 773 F. App'x 254, 263-64 (6th Cir. 2019). The Sixth Circuit has further explained why it is appropriate to accept temporal proximity alone when the adverse action occurs very soon after the protected activity:

> [T]he more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with "other evidence of retaliatory conduct to establish causality." *Id.*

> In *Mickey,* the case for inferring causation from temporal proximity was very strong, because Mickey's employer fired him the very day he learned of Mickey's charge with the Equal Employment Opportunity Commission ("EEOC"). *Id.* We wrote that Mickey's case exemplified the original justification behind using temporal proximity to infer causal motivation: "[I]f an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and *little other than the protected activity could motivate the retaliation.*" *Id.* (emphasis added).

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010).

Here, the adverse actions occurred very soon after the protected activity. So soon, in fact, that there was virtually no subsequent work time periods during which any other incidents indicative of retaliation could have occurred. Hardiman was told his "services were no longer needed" by the Company just two hours after he provided information to Cusumano about Al-Hanna's harassment of Schoenherr. Karaszewski was suspended the very day that she forwarded Schoenherr's sexual harassment complaint to the Company. Thus, she never worked at the Company after engaging in the protected activity. The same is true of Schoenherr – her last day worked at the Company was the day that her complaint was provided to the Company by Karaszewski. Korkis had the longest gap between her protected activity and her adverse action. But Korkis only worked at the Company for two days after she corroborated Schoenherr's complaint.

As such, the Court concludes that the temporal proximity alone in this case is sufficient to create an issue of fact as to the causal connection element of a prima facie case of retaliation – as to all four employees.

Moreover, even beyond that temporal proximity, there is other circumstantial evidence that could support an inference of a causal connection. For example, the employee making the complaint, the supervisor who reported that complaint to the company, and the two employees who corroborated the complaint *were all* suspended or terminated within hours or days of their related protected activity. Another example is that Schoenherr's temporary assignment was terminated by the Company after she engaged in the protected activity, ostensibly because production had slowed down, yet the Company kept other temporary workers on that had less

experience than her. Moreover, there is evidence that Safie not only canceled her assignment and that of Hardiman, but told the employment agency she "did not want them on the property," a statement from which a reasonable juror could infer that more than a production slowdown was behind Safie's decision to terminate their services. This kind of circumstantial evidence could permit an inference of a causal connection.

**B.      Pretext – Can The EEOC Show That The Company's Stated Legitimate, Non-Retaliatory Reason For The Terminations/Suspensions Are A Pretext For Unlawful Retaliation?**

If the plaintiff can establish a prima facie case of retaliation, then the analysis moves on the pretext phase of the analysis:

> Under the *McDonnell Douglas* framework, after the plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a nondiscriminatory reason for its actions. The defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times." *Mickey,* 516 F.3d at 526 (citations omitted). If the defendant articulates a legitimate, nondiscriminatory reason for its actions, then the plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. *Hunter,* 565 F.3d 986, 996 (6th Cir.2009). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Mickey,* 516 F.3d at 526 (quoting *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir.2000)).

*Galeski*, 435 F. App'x at 470.

Here, the Company asserts that it had legitimate, non-retaliatory reasons for the terminations of the four employees at issue. The Company claims that "Schoenherr and Hardiman were scheduled to be let go before the harassment complaint because of a drop in seasonal sales." (ECF No. 17 at PageID.84). The Company claims that "Korkis was terminated because she was disruptive on the floor by getting into physical altercations with Nissan." (*Id.*) Finally, the Company contends that Karaszewski was terminated because she did not promptly

report the sexual harassment complaint." (*Id.*).

### Schoenherr And Hardiman

Schoenherr and Hardiman were the two employees who Karaszewski told Safie, during a conversation on February 26, 2016, were aware of the sexual harassment by Al-Hanna. The Company claims that Schoenherr and Hardiman were let go because of a drop in seasonal sales.

But the EEOC has submitted evidence to show that the Company terminated the assignments of these experienced workers based on alleged production needs, yet kept other, less experienced workers who had not engaged in protected activity. In addition, Safie testified that although Rashid from Human Resources usually dealt with the Company's temporary employees, on this occasion Safie called the company herself. (Safie Dep. at 121). And there is evidence that Safie not only cancelled the assignments of Schoenherr and Hardiman, but told the temporary agency that she did not "want them on the property." (*Id.*). Moreover, that Safie terminated their assignments so soon after their protected activity could also be construed as evidence of pretext.

### Korkis

The March 11, 2016 letter that the Company sent to Korkis stated, "Effective immediately, please be advised that your employment with Safie Specialty Foods has ended. We wish you well in your future endeavors." (ECF No. 20-26). The Company stated no reason for the termination.

The Company now claims that Korkis was terminated because she was disruptive on the floor by getting into physical altercations with a co-worker named Fadi Nissan.

The EEOC has offered sufficient evidence such that a reasonable jury could conclude that

the Company's stated reason is not the actual reason for her termination and is a pretext for retaliation. Korkis has submitted a Declaration wherein she states that she was never told that she was being fired or suspended because of anything having to do with Fadi Nissan. (ECF No. 20-15). Korkis denies that she ever had any altercations with Nissan. Korkis states that she was never written up or reprimanded in relation to Nissan. Indeed, the Company has not produced any write-ups or disciplinary notices pertaining to Korkis involving Nissan.

Although Korkis had been employed by the Company since January of 2015, she states that she only received one written warning, and that was back in September of 2015 for being late to work. (*Id.* at ¶ 4). Korkis's Declaration also describes the events surrounding her February 27, 2016 conversation with Safie and Haddad (that involved only the sexual harassment complaint and not Nissan, even when he popped into the meeting), and her later meeting with Rashid and Pavone (wherein they looked at each other when Korkis told them the meeting with Safie was about the sexual harassment complaint, not Nissan). Viewed in the light most favorable to Plaintiffs, that is also evidence that the claimed reason for her termination is pretextual.

Safie's testimony regarding the reason why Korkis was fired (ie., stating "I don't know why she would've been fired" but then also stating Korkis "created a hostile work environment" by virtue of getting hit and kicked by a co-worker and not doing anything about it) could also cause a reasonable juror to doubt the veracity of the Company's stated reason for Korkis's termination. The same is true of Human Resources Manager Rashid's testimony (i.e., that she had concerns about Korkis's termination because it did not make sense to her.)

**Karaszewski**

The Company claims that Karaszewski was terminated because she did not promptly report the harassment report she received.

The EEOC contends this stated reason has no basis in fact because Karaszewski did, in fact, promptly report Schoenherr's complaint. A reasonable jury could conclude, based on record evidence presented, that the Company's stated reason lacked a factual basis and/or did not motivate its decision. Karaszewski received the complaint from Schoenherr approximately forty five minutes before closing time on February 24, 2016. It is undisputed that neither of the Company's Human Resources representatives (Pavone and Rashid) were at work that day. Karaszewski testified that she made an effort to find Safie. There is also testimony that employees were told not to approach Safie with issues. The following work day, the Company was closed due to inclement weather. The very next morning, when the Company reopened, Karaszewski reported the complaint to Cusumano. Karaszewski was then suspended that day, for having not brought the complaint sooner.

Meanwhile, the employee who was alleged to have actually committed the sexual harassment, Al-Hanna, was not investigated or suspended until March 10, 2016, and that was only after Karaszewski filed a formal Charge of Discrimination.

In addition, even if Karaszewski had violated the Company policy by delaying her report, there is evidence that Safie chose not to take any disciplinary action for far more serious conduct, such as Al-Hanna's "fighting and threatening behavior" on December 10, 2015. (*See* ECF No. 20-31) (Indicating that "Mary did not want to take disciplinary action" when a suspension was recommended). Safie herself testified that she saw a male employee (Nissan) kick a female employee (Korkis) in the workplace, and behave in a manner in front of her that

was so aggressive she "should've called the police," but yet Safie did not even fill out an incident report. (Safie Dep. at 180-85; *see also* Rashid Dep. at 48-49).

The EEOC has offered sufficient evidence such that a reasonable jury could conclude that the Company's stated reason for firing Karaszewski was a pretext for retaliation.

Accordingly, the EEOC has offered sufficient evidence of pretext as to each of the employees on whose behalf it brings a retaliation claim and the EEOC therefore survives summary judgment.

Again, the EEOC's motion seeks summary judgment in its favor as to liability as to the retaliation claims but that would not be appropriate.      The claims shall proceed to a jury trial.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that both summary judgment motions are DENIED and all claims asserted in this action shall proceed to a jury trial.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  November 5, 2019